UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    -against-

DANIEL LEO

08 Cr. 874 (RJH)

**MEMORANDUM OPINION**

---

Richard J. Holwell, District Judge:

On March 23, 2010, the Court sentenced Daniel Leo to 18 months in prison for racketeering crimes. The Court imposed the sentence to run consecutively to a 60-month sentence imposed by Judge Kaplan in February 2008 for related conduct—namely, two extortion conspiracies that fell within the scope of the later-charged racketeering conduct. The case raised complex issues about how the related conviction and sentence should impact the instant sentence. The Court writes now to explain its analysis.[1]

## BACKGROUND

On October 31, 2007, Daniel Leo ("Leo") pleaded guilty to two counts of conspiracy to commit extortion based on allegations of loansharking and gambling-related conduct. (PSR at 20-21.) It was an unusual and probably misguided plea, because Leo had reason to believe that it would not resolve the government's case against him. Two months earlier, at a conference before Judge Kaplan, the government had

---

[1] The Court also sentenced Leo's nephew and co-defendant, Joseph Leo, on March 24, 2010. Joseph Leo's case raised the same salient legal issues as Daniel Leo's case, and the Court resolved both cases in the same way, *mutatis mutandis*, with precise sentencing figures (such as time already served) posing the only differences. The Court intends for this opinion to clarify its reasoning in both cases, but for ease of discussion, it focuses on Daniel Leo.

announced that it intended to bring additional charges against Leo based on newly discovered evidence of similar gambling-related and extortionate conduct. Despite the clear risk that he would be indicted again, Leo opted to plead to the extant charges. Explanations of why he did so vary. His current counsel argues that Leo received bad advice from his lawyer at the time, whom he has since replaced. (Def. Mem. at 2-3 ("This course was clearly hazardous: Leo would likely end up facing two separate but related indictments, instead of a single indictment covering the entire course of conduct. Leo would thus be exposed to not one, but two significant prison sentences . . . .").) The government contends that Leo made a reasonable decision to "gamble[] that [he] would not be indicted again . . . ." (Gov. Mem. at 13.) The pretrial schedule may also have contributed to the result: the district court ordered the government to file any superseding indictment by November 1, 2007, which the government was apparently unable to do given the ongoing nature of its investigation. (Def. Mem. Ex. A at 4-6.) Whatever the reason, Leo made the plea, and on February 28, 2008, Judge Kaplan sentenced him to 60 months in prison, working from a Guidelines Range of 57 to 71 months. (PSR at 20, 33.)

The government proved good to its word, however, and this case resulted. Leo was indicted a second time on February 4, 2009, for more loansharking and gambling-related conduct. Along with additional counts of extortion and illegal gambling, the new indictment stated charges under the Racketeer Influenced and Corrupt Organization Act ("RICO")—one for a substantive RICO violation and one for a RICO conspiracy. (PSR at 3-4.) There is no dispute that the extortion conspiracies from the first case could have been charged as predicate RICO acts in the second indictment; as defendant correctly notes, "the convictions in this case and [the] previous case are all rooted in the same time

2

period, involved the same defendants, were discovered through a single investigation and a single set of government recordings, and clearly could have been joined in a single indictment under Rule 8 of the Federal Rules of Criminal Procedure." (Shargel Ltr. dated March 19, 2010, at 2.)

On January 12, 2010, Leo and the government entered a plea agreement whereby Leo would plead guilty to the RICO conspiracy and the substantive RICO count in exchange for dismissal of the remaining counts and an agreement that the government would not prosecute him further for any extortionate conduct during the time period covered in the indictment (2003 through 2007). In pleading to the substantive RICO count, Leo agreed to admit participation in two racketeering acts—an extortion scheme and a conspiracy to conduct an illegal gambling business. (Def. Mem. Ex. B. at 1-2.) The parties stipulated that the applicable offense level under the Sentencing Guidelines would be 22. (*Id*. at 4.)

The plea agreement expressly left two legal issues open to argument at sentencing: first, Leo's proper criminal history category ("CHC") under § 4A1.1 of the Guidelines; and second, the extent to which the sentence should run concurrently with the undischarged portion of the prior sentence. With regard to the first issue, the Government took the position that the prior conviction should be counted as part of Leo's criminal history, which would give him three criminal history points, placing him in CHC II. *See* U.S.S.G. § 4A1.1 (2009).[2] At the stipulated offense level of 22, this CHC

---

[2] All citations to the Sentencing Guidelines are to the 2009 version, which is the version the Probation Office applied in the PSR. (PSR at 17.) Neither party objected to this aspect of the PSR. Further, no differences relevant to this case exist between the current version of the Guidelines and the version in force at the time of the offense conduct, which ended in 2007. Thus, it is unnecessary to determine whether application of the current version poses an *ex post facto* problem. *See United States v. Johnson*, 558 F.3d 193, 195 n.2 (2d Cir. 2009).

determination would produce a Guidelines Range of 46-57 months.  Leo, on the other hand, argued that the prior conviction formed "part of the instant offense" and therefore constituted "relevant conduct" that did not count as criminal history under § 4A1.1 and .2 of the Guidelines.  Under this view, Leo would fall in CHC I, lowering his Guidelines Range to 41-51 months.

With regard to the second issue—concurrency—the parties agreed that the Court had discretion under § 5G1.3(c) to impose a sentence to run "concurrently, partially concurrently, or consecutively" to the undischarged portion of the Kaplan sentence.  The government requested a Guidelines sentence to run entirely consecutively to the Kaplan sentence, while Leo argued for a sentence to run concurrently to the undischarged portion of the Kaplan sentence, which at the time of sentencing was approximately 26 months (without accounting for any anticipated good conduct credit).  Though § 5G1.3(c) also permits downward departures to account for time already served for related conduct, *see* U.S.S.G. § 5G1.3 n.3 (E), the plea agreement did not permit Leo to seek any credit for the 34 months already served on the Kaplan sentence; he was only allowed to argue for concurrency going forward.  Thus, under the strictures of the plea agreement, the lightest incremental punishment Leo could seek was 15 months: the product of a Guidelines sentence of 41 months (assuming a CHC of I), minus 26 months to be served concurrently to the undischarged portion of the Kaplan sentence.

The Probation Office analyzed the case quite differently than either party.  It agreed with the government that Leo had a CHC of II and a Guidelines Range of 46-57 months. (PSR at 32.)  However, to reach the appropriate sentence, Probation considered what Leo's Guidelines Range would have been had he been sentenced for both sets of

4

convictions—from the Kaplan and Holwell cases—at the same time.  It found this Guidelines Range to be 63 to 78 months.  Because Leo received a 60-month sentence from Judge Kaplan, Probation concluded that an additional 10 months of incarceration (for a total 70-month term between the two sentences) would serve the interests of justice.  It therefore recommended a Guidelines sentence of 46 months with only 10 months to run consecutively to the Kaplan sentence—a more lenient punishment than the plea agreement permitted Leo to seek.  (*Id.* at 33.)[3]

At sentencing, the Court also disagreed with both parties' reasoning and adopted an analysis similar to Probation's, though under a different application of the Guidelines. First, the Court found that the prior conviction for conspiracy to extort constituted "relevant conduct" for purposes of Leo's criminal history level (meaning the conviction would not count as criminal history) *and* his offense level (meaning that the conviction would increase the offense level).  This analysis placed Leo in CHC I but increased his offense level to 26, producing a Guidelines Range of 63 to 78 months, the same range that would have applied had Leo been sentenced for all the conduct at once.  Secondly, the Court held that § 5G1.3(b) governed the concurrency analysis—not § 5G1.3(c), which the parties focused upon—because the prior conviction increased the offense level for the instant offense, thereby placing this case squarely within subsection (b).[4]  Unlike

---

[3] Probation did not specify which Guidelines provisions the Court should apply to impose the recommended sentence.

[4] Subsection (b) reads as follows:

If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:

5

subsection (c), subsection (b) requires that a defendant receive credit for time already served on a related sentence.  U.S.S.G. § 5G1.3(b)(1).  Thus, the Court adjusted Leo's sentence for time already served, not simply for the undischarged portion of the Kaplan sentence.

Below, the Court explains its analysis of both legal issues—"relevant conduct" and the applicability of § 5G1.3(b)—as well as its actual calculation of Leo's § 5G1.3(b) sentence, which posed unique issues given the parties' joint request that the Court state the sentence as a consecutive term, rather than as a concurrent term as the provision contemplates.

## DISCUSSION

As pertinent to this discussion, the Guidelines define "relevant conduct" as follows:

### § 1B1.3.  Relevant Conduct (Factors that Determine the Guideline Range)

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

  (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .

  that occurred during the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

  (2) solely with respect to offense of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in

---

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

U.S.S.G. § 5G1.3(b).

6

>   subdivisions (1)(A) and (1)(B) above that were part of the same course of
>   conduct or common scheme or plan as the offense of conviction . . . .

If a prior conviction constitutes "relevant conduct" under this provision, two important and reflexive consequences follow. First, the prior conviction will be considered in calculating the defendant's base offense level. *See id*; *see also* U.S.S.G. § 4A1.2, application note 1 ("Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3."). Secondly, if the conviction is "relevant," it will <u>not</u> count as criminal history. U.S.S.G. § 4A1.2, application note 1 (In computing criminal history, "'[p]rior sentence' means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense.").

In their sentencing memoranda, the parties focused their arguments exclusively on subsection (a)(2) of § 1B1.3—namely, on whether the prior conviction was "relevant" for criminal history purposes because it formed "part of the same course of conduct or common scheme or plan as the offense of conviction."[5] The Court agreed with the government that this subsection, by its plain language, applies only to offenses that group under § 3D1.2(d). Because § 3D1.2(d) expressly excludes conspiracy to extort (the offense underlying the prior conviction) from grouping, the Court held that the prior conviction was not "relevant conduct" under subsection (a)(2). *See* § 3D1.2(d); 1B1.3 n. 3 ("[Subsection (a)(2)] applies to offenses for which grouping of counts would be required under § 3D1.2(d) had the defendant been convicted of multiple counts.");

---

[5] Originally, the parties did not address whether the conviction was also relevant for purposes of calculating the offense level, presumably because they had stipulated to an offense level in the plea agreement. In supplemental briefing requested by the Court, however, the government argued that the prior conviction could only be "relevant" for criminal history purposes if it was also relevant for offense level purposes. Because both determinations turn upon application of the same Guidelines provision—§ 1B1.3—the Court agrees with this argument. *See* U.S.S.G. § 1B1.3(a); § 4A1.2 n.1.

Gordon Mehler et al., *Federal Criminal Practice* 687 (10th ed. 2010) ("Subsection (a)(2) of § 1B1.3 applies only when the grouping rule in § 3D1.2 applies . . . .").

*United States v. Brennan*, 395 F.3d 59 (2d Cir. 2005), upon which Leo relies, does not require a different result. In one passage, *Brennan* appears to combine language from subsections (a)(1) and (a)(2) of § 1B1.3 in a way that effectively reads the grouping requirement out of (a)(2). *See id.* at 70 ("Section 1B1.3 defines relevant conduct as 'all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant' that 'were part of the same course of conduct . . . .'"). Despite this curious quotation, however, *Brennan* does not actually implicate subsection (a)(2)'s grouping requirement. First, the conduct at issue in the case—fraudulent concealment of assets—is not expressly excluded from the scope of § 3D1.2(d), unlike conspiracy to extort. Secondly, § 3D1.2(d) states that conduct not expressly included or excluded from its scope should group if, based on a case-specific determination, the court finds that the conduct produced an "aggregate harm." Though *Brennan* does not reference any such case-specific determination, the conduct there would appear to meet the "aggregate harm" test. *See id.* at 67 ("[T]he money at issue in the bankruptcy fraud [the prior crime] . . . was the source of the $1.5 million [at] the heart of the criminal contempt charge [the offense of conviction]."). Thus, because there is no indication that the conduct in *Brennan* ran afoul of the grouping requirement, that case cannot be read to excise the requirement from the plain language of subsection (a)(2).

Though the Court found subsection (a)(2) inapplicable, it determined that the prior conviction was nonetheless "relevant conduct" under subsection (a)(1), which

8

covers "all acts and omissions . . . that occurred during the commission of the offense of conviction." Because Leo's "offense of conviction" was a RICO conspiracy, and because the extortion conspiracies underlying the prior conviction were predicate acts of the RICO conspiracy (indeed, the government never disputed this point), those extortion conspiracies occurred "during the commission of the offense of conviction" under subsection (a)(1). They are therefore relevant conduct to be used in calculating the proper offense level. Second Circuit precedent supports this conclusion. *See United States v. Massino*, 546 F.3d 123, 135-36 (2d Cir. 2008) ("When the offense of conviction is a RICO conspiracy, relevant conduct may include 'underlying predicate acts' . . . .") (citing *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008) (predicate acts that do not form part of offense of conviction are "relevant conduct" to RICO conspiracy)). Admittedly, *Massino* and *Yannotti* involved conduct that had been charged together in a single indictment; the defendants in those cases had won acquittals of certain predicate acts but were convicted of RICO conspiracy, and the district courts considered the predicate acts as "relevant conduct" at sentencing. *See id*. In this case, of course, the extortion conspiracies and the RICO conspiracy were prosecuted separately. But the distinction is immaterial. The "relevant conduct" analysis is in no way constrained by the scope of a single indictment or by the government's decision to charge related conduct together or separately. *See Witte v. United States*, 515 U.S. 389, 393 (1995) ("Under the Sentencing Guidelines, the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction.");[6] U.S.S.G. § 1B1.3

---

[6] *Witte* also makes clear that enhancing Leo's offense level based on the prior conviction does not raise double jeopardy concerns. 515 U.S. at 399 ("[U]se of evidence of related criminal conduct to enhance a

9

*Background*, at 30 ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").

Thus, in the Court's opinion, the extortion conspiracies are "relevant conduct" under § 1B1.3(a)(1). This determination triggers three consequences that, in combined effect, result in a sentencing posture that simulates what would have happened had Leo been sentenced for the convictions in both cases at once. First, the extortion conspiracies increase his total offense level from 22 to 26, adding two points at the base offense level under § 2E1.1(a) and two more "combined offense" points under § 3D1.2. (*See* Def. Mem. at 5; Shargel Ltr. dated March 8, 2010.)[7] Second, because the extortion conspiracies are "relevant," they generate no criminal history points, leaving Leo in CHC I. *See* § 4A1.2. At offense level 26 and CHC I, Leo's Guidelines Range is 63 to 78 months.

Third, and perhaps most significantly, the Court's application of § 1B1.3(a)(1) triggers the mandatory concurrency provisions of § 5G1.3(b), which applies where an undischarged term of imprisonment "resulted from another offense that is relevant conduct to the instant offense of conviction . . . and that was the basis for an increase in the offense level." U.S.S.G. § 5G1.3(b). Where these prerequisites are satisfied, § 5G1.3(b) requires district courts to, first, adjust the sentence to reflect time already served on a related sentence, and second, to impose the sentence to run concurrently to the time remaining on the related sentence. *Id*. Thus, subsection (b) differs from subsection (c)—

---

defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause.").

[7] Neither party disputed this calculation, though the government asserted that it would have required Leo to plead to additional counts had all the conduct been charged together. (Gov. Mem. at 15.)

the provision under which the parties framed their concurrency arguments—in that its provisions are mandatory, not discretionary, and in that it requires credit for time already served on a related sentence, not simply concurrency with the undischarged portion of a related sentence. *See United States v. Gonzalez*, 192 F.3d 350, 354-55 (2d Cir. 1999).

Once the Court determined that the prior conviction was "relevant conduct" and factored it into the offense level for the instant conviction, raising it from 22 to 26, § 5G1.3(b) plainly governed the sentencing analysis. *See United States v. Fernandez*, 309 Fed. App'x 461, 463 (2d Cir. 2009). Actual application of subsection (b), however, proved nettlesome. Typically, calculation of a sentence under this subsection is straightforward: the court determines the appropriate sentence (considering the Guidelines Range and § 3553 factors), then subtracts the time already served on the related sentence, and imposes the resulting term to run concurrently to the undischarged portion of the related sentence. *See* U.S.S.G. § 5G1.3(b) n.2(D); *Gonzalez*, 192 F.3d at 354. For Leo, the Court determined that the appropriate total punishment was 70 months, in the middle of the Guidelines Range of 63-78 months. Thus, the standard § 5G1.3(b) application would have been as follows: 70 (the punishment the Court deemed proper) minus 34 months already served, for a resulting term of 36 months to be served concurrently with the undischarged portion of the Kaplan sentence.

The parties, however, requested that the Court not impose the sentence in this manner. Rather, citing the inscrutability of the BOP rules for calculating concurrent sentences, the parties jointly requested that the Court "clearly state the sentence in terms of the number of months that defendants are to serve consecutive to their existing sentences." (Gov. Mem. at 15; Shargel Ltr. dated [March] 10, 2010, at 3.) Having

11

recently grappled with these confusing BOP rules, *see Lopez v. Terrell*, 2010 WL 1133864 (S.D.N.Y. March 26, 2010), the Court granted the joint request. Thus, it became necessary to compute Leo's sentence in a manner that § 5G1.3(b) does not contemplate—as a purely consecutive term, rather than a partially concurrent term beginning on the date of imposition. Calculating the consecutive term, in turn, required adjusting the 70-month sentence for all of the time Leo *will have served* upon completion of the Kaplan sentence, rather than simply crediting the time *already served* and ordering the two sentences to run together going forward. Of course, the precise amount of time a defendant spends in prison depends on his conduct while incarcerated, *see* 18 U.S.C. 3624(b) (authorizing sentencing awards, called "good conduct time" or "GCT," for compliance with institutional regulations), making it impossible to know in advance exactly how much time a prisoner will serve on a sentence. In Leo's case, if he earns all available good conduct time under § 3624(b), he will be released on October 7, 2011, according to BOP projections. (Gov Mem. Ex. B.) Bad behavior, however, could extend his sentence by another eight months, approximately.[8] (*Id*. at 15.) Thus, the parties' request required the Court to calculate the time Leo would serve on the Kaplan sentence before it was possible to ascertain that information.

There are two ways to address this problem. First, the Court could disregard the prospect of good conduct time and simply subtract the full Kaplan sentence, 60 months as imposed, from the 70 month term. Alternatively, the Court could estimate how much good conduct time Leo will receive and deduct that credit—which represents time Leo

---

[8] If Leo, who has been incarcerated since the date of his arrest, serves a full 60 months on the Kaplan sentence, his release date would be May 30, 2012. (PSR at 20 (reflecting arrest date of 5/30/07).) Given that his earliest possible release date is October 7, 2011, 7 months and 23 days is the maximum amount of good conduct time available to him.

probably will not serve—from his sentence adjustment. Because this is a problem of the parties' creation (and the Court's, for indulging their request), no case law addresses the issue.

Much recommends the first solution. As this Court recently recognized, good conduct time is an administrative device; its purpose is to encourage good behavior, not to vindicate penal interests. *Lopez*, 2010 WL 1133864 at *13 (citing *Sash v. Zenk*, 428 F.3d 132, 134-35 (2d Cir. 2005)). Good conduct time therefore bears little relevance to sentencing determinations, because it has nothing to do with justice, or deterrence, or any other penal consideration. Furthermore, estimating the amount of GCT Leo will ultimately earn on the Kaplan sentence requires prediction of future events, because the final tally will depend on his behavior between now and October 2011. Thus, not only does consideration of good conduct time seem out of place at sentencing, but such consideration poses temporal quandaries.

Despite these concerns, however, the Court ultimately decided to take the BOP's good conduct projections into account. Leo has a spotless record in prison; there is little doubt that his actual release date for the Kaplan sentence will in fact be October 7, 2011. (PSR at 12.) To disregard the projections would be to disregard the reality of Leo's circumstances. The parties requested a pragmatic solution to the problem of calculating Leo's concurrent sentences, and the Court concludes that it would not be pragmatic to ignore the obvious fact that Leo will not actually serve 60 months on the Kaplan sentence. Moreover, the Court selected a 70-month "total" sentence precisely because it concluded that the offense conduct in *this case* (as opposed to the prior case) warranted an 18-month incremental punishment. That is, the Court found that it would serve the

interests of justice for Leo to serve 18 months *beyond* the time he will serve for the prior conviction (subject, of course, to whatever good conduct time Leo might earn on the additional 18 months). (Sentencing Tr. at 15:2-23.) The argument over how the Court should account for potential good conduct credit is therefore academic; it does not impact the sentencing result. If the Court had decided not to consider GCT, it would have imposed a 78-month sentence adjusted for the full 60-month prior sentence, leaving a consecutive term of 18 months. Instead, the Court decided to give Leo a 70-month sentence adjusted for only 52 months (60 minus 8, the approximate amount of time Leo will not have to serve due to good conduct), leaving the same 18-month consecutive term. Either way, the same result obtains.

## CONCLUSION

For the reasons stated, the Court sentenced Daniel Leo to a term of 18 months in prison to run consecutively to the undischarged sentence imposed on February 28, 2008.

SO ORDERED.

Dated: New York, New York
       April 16, 2010

_____

Richard J. Holwell
United States District Judge